Parallel Networks, Inc. v. Parallel Networks, Inc. v. Parallel Networks, Inc. v. Parallel Networks, Inc. v. Parallel Networks, Inc. May it please the Court. My name is Eric Burrish. I'm counsel for appellant in this matter with me is Michelle Marriott. There are a number of, I would say a handful of errors that I believe the Board committed in this particular proceeding. I'm going to focus on one today so that our time is more focused. I believe the Court should reverse the Patent Trial and Appeal Board in this matter because the Board imposed requirements on the challenged claims that have no predicate in the challenged claims. In its final written decision, the Board focused almost exclusively on the question of whether the prior art referenced in O'Hara disclosed a claim limitation I'm going to refer to as allowing the client to join a cash community from claim one and the corollary limitation from claim two, which is determining whether to allow a client to join a cash community. We posited to the Board that in O'Hara disclosed these limitations by its activity related to a server group. The server group in O'Hara is a bounded group within a caching system. Bounded means that it has a maximum size. The disclosure of O'Hara is very clear that when a server attempts to join a server group and that server group is already at its maximum size, the new server attempting to join will be refused admittance to that server group and in the express words of O'Hara, a new group is formed. It's referred to as a new group in Figure 5. It is referred to as new groups repeatedly in Column 8. So that's what the Board at its institution decision found that it was likely that that would be their conclusion. But ultimately, though, they had a different view of what the cash community in O'Hara is, correct? Your Honor, that's correct. The Board found what it referred to as, quote, the relevant cash community and found that that was the cash hierarchy that was disclosed in InoHara. So InoHara has a couple of concepts. One is a server group that operates as a cash community, but it is part of a larger cash system that has numerous server groups, and those server groups are interconnected in what is called a hierarchy. So the server groups of InoHara do have a caching identity, and I think that's critical, and the Board actually found that. One of the things in the Board's construction that it looked for was whether there was identity or similarity, and in InoHara you see a group table that specifically defines the contents of a server group, not the contents, excuse me, the members of a server group. So the members of a server group share an identity by being grouped together in a group table. There is also the concept of a cache directory in InoHara, and that cache directory is specific to each server group. So every server group in InoHara has a cache directory. That provides a participation together as part of a caching entity. Now you see in the disclosure of InoHara, and we've laid this out in our brief, when new content, cached content, is received into a server group, the cache directory is updated and transmitted to the server group. When cached content is removed from the server groups in InoHara, again, a message is sent to the members of that group to remove the cached content from that particular cache directory. The caching entity in InoHara is the server group, but to the Board's point, there is a broader system that operates overarching the server groups. We don't dispute that. But what the prior art shows is a question of fact, correct? What the prior art shows, sure, can be a question of fact. And the Board found, based partially on some expert testimony, that the cache community in InoHara had to be the broader hierarchy. We need to look very specifically at what the Board said, Your Honor. And that's at specifically three pages of the final written decision. It is appendix pages 24 through 26. In those pages, and it's specifically appendix page 26, where the Board talks about the fact that the hierarchy is what it calls the relevant cache community. And it is our position, Your Honor, that there is no limitation in the claims of the 145 patent that specify that there needs to be a relevant cache community. The claims of the 145 patent speak solely in terms of whether there is a decision to allow a client to join a cache community, not the relevant cache community. And I don't want to take anything away from the Board, because clearly the relevant cache community is a phrase at use, but we need to look at its underlying rationale. It seems like, why I'm going to be really simple-minded here, it seems like you're arguing that since you and your opposing counsel are both members of the community of people who are eligible to practice before the Federal Circuit, because you're members of the Federal Circuit Bar, you and opposing counsels are members of this community to practice before the Federal Circuit Bar. It seems like your argument is that only two of you are present here, and thus you represent a unique community of two somehow, by virtue of your shared traits as members of the Federal Circuit Bar. I don't understand that. If the community is of all members of the Federal Circuit Bar, the fact that there's just two of you here doesn't make you a separate community. And that's what I feel like you're up against. The logic that the Board adopted is clearly simplified by me here, oversimplified. Possibly you can tell me why that logic is wrong. Yeah, because other than the happenstance of us happening to be in the same room at the same time, my colleague and I don't share anything that makes us a unit. There is nothing other than our membership in the greater community of the Federal Circuit Bar that would cause my colleague and I to be a community. That's not an issue that the Board had. The Board recognized and agreed expressly that the server groups of Inohara were a community, and it could not hold otherwise because the group table defines the server groups as a community. There's no question about that. But are you saying that there are two cache communities in Inohara? I'm saying that the server group is a cache community that satisfies the claim limitations of the 145 Act. You have to be saying there's multiple cache communities in Inohara. And that there can be larger cache communities. Now let's look at the 145 Act. Why didn't you argue that even under the Board's view of Inohara as the entire thing being the cache community that it shows allowing somebody to join? Because the Board built a negative limitation of the claim. I don't have a problem with that. What the Board said is there has to be— Why not? I mean, frankly, that seems like a really bizarre claim construction that allowing has to implicitly include the right to deny. But you didn't challenge that, and you're not challenging that today. But to answer your question, the hierarchy, if you want to call the hierarchy the cache community, every server is allowed into the hierarchy. It's just not allowed into particular server groups. So that possibility of denial is at the server group level. But let's look at the 145 Act, because I think the salient question, my point to begin with, is that the Board imputed limitations into the claim that are not existent there. And that, therefore, they limited the broadest reasonable interpretation of the claims. If we look at the 145 Patent, what are we going to find? We're going to find a caching system that has multiple communities in it. If a peer in terms of the 145 Patent seeks to join a particular cache community in the terms of the 145 Patent and is denied admittance to that cache community, what happens? Is it precluded from participating in caching? No, the peer in the 145 Patent will either join a different cache community or it will form its own cache community, just like in InoHara. In the 145 Patent, there is a broader caching system and there are multiple cache communities within the caching system. So to come back and say InoHara's server group cannot be the relevant cache community is to build one of two limitations into the claim. One, they're saying that a server, when it attempts to join, must be precluded altogether from a holistic caching community. And that is completely and directly inconsistent with the 145 Patent. The other rationale that you see from the Board, and this is on A25, the Board stated InoHara does not disclose limiting propagation of the cache directory to within a server group that forms the multicache hierarchy. In other words, the Board was saying there's nothing in InoHara, you petitioner have not shown the Board that InoHara expressly says there's no cooperation within the server groups. That's not a requirement of the 145 Patent. If we look at the 145 Patent, there is no statement in that patent that the communities, the cache communities of the 145 Patent, in which there are a plurality, do not participate together. There's no statement like that in the 145 Patent. And I query, if that is a claim limitation, if there is a requirement that the server groups or the cache communities operate in complete isolation, why would there not be some statement to that effect in the 145 Patent? But there is none. For both of these reasons, Your Honors, it is my position that the Board imputed limitations to the claims of the 145 Patent, unduly restricted those claims, and then tested the prior art against those non-existent limitations. That is a legal error subject to de novo review that should result in reversal of the Board's decision here. I'll reserve the remainder of my time for rebuttal. Okay. Thank you. Mr. Collins, please proceed. Thank you. Your Honors, my name is Darren Collins, and I represent Appellate Networks. The appellant's contention in this case is that the Board committed a legal error. Our belief is, if you look at each of their arguments, it's the factual underpinnings of the Board's conclusion that are issued here, and the appropriate standard in all cases is one of substantial evidence. The Board looked at the central teaching of Inohara, which is a teaching of inclusion. It looked through each example in Inohara to determine if the specification ever taught that a server was denied entrance into a cash community, and they concluded in a negative. They looked at the expert testimony presented in this case, which includes roughly 20 pages of testimony from Dr. Thornton, as to the exact issue on this appeal. What does a combination of Inohara, when taken in combination of Smith, teach to one of ordinary skill in the art? This is an application that was translated from a Japanese application. Admittedly, some parts of it are confusing, and our purpose in the expert testimony of Dr. Thornton was to really look at, in detail, the teachings to one of ordinary skill in the art. Our position is that that testimony was never challenged. It was never questioned. It was never contradicted by the expert of Reloaded. His testimony said very little about the teachings of Inohara, and balanced against the very considerable testimony and strong feelings of Dr. Thornton on the teachings of the combination of the references, the Board clearly had substantial evidence to reach the conclusions that they did. Where is it clear that the 145 would exclude, or the 145 would exclude having more than one cash community? The 145 talks about being able to select between different cash communities based on, effectively, how much latency there would be and how long it would take to access content. The 145 does teach selecting between different cash communities. Inohara doesn't. At the server group level, you don't think it does? On the server group level, no. Inohara's teaching is, all of the existing prior cash architectures have size limitations, and that doesn't work for a large network like the Internet. That's really the central goal of Inohara. It expressly says that. Look, how do we construct a cash hierarchy that can be infinitely scalable and work for a very large network? And that doesn't work if you've got size limitations. So Inohara's primary teaching is, how do we construct a community into a hierarchy, and we're still able to communicate down all the communication needed to manage that hierarchy, and we still achieve the goals of a cash? And Dr. Thornton talks about this. You want to reduce latency. You want to increase the hit rate on the cash content that you're asking for. And Inohara comes up with a structure that I think does this, and it's one hierarchy. It's one unified structure. When a new server comes on board, it's not rejecting it or accepting it. It's figuring out where in the hierarchy it best fits so that it can manage communications efficiently. And Dr. Thornton talks about the big problem that Inohara overcomes, which is, once you have a large number of servers and the architectures like Smith, for example, you have a lot of communications bandwidth, and that actually is counterproductive because it means you're going to get the content slower because of all the communications to manage the cash. So Inohara teaches this one hierarchical tree structure where communications are propagated from branch to branch, from group leader to group leader, to manage accessing cash and managing cash content. And if you look at Inohara, Inohara certainly could have taught separate cash communities, but it didn't. Its goal was entirely different. Its goal was to construct one unified community that works for a large network. And the server groups are building blocks of that network. They are contrivances to manage that communication. You're passing communications from one server group leader down to the next server group leader, and it works exactly like the old telephone tree our PTA used to use when I was a kid in school. It's the head of the PTA calls five members of the PTA, and they call five more parents, and they each call five parents until the whole community is informed. It doesn't mean because I'm being called by Mr. Smith, and not Mr. Jones called Mr. Smith, that I'm not part of that community. It's a contrivance to make sure that we've got efficient communications. And the spec talks about that propagation of communications, including the cash directory. Is there a difference in the claims between the term cash community and community? No. And that's one of the arguments that's presented by Appellants Below. If you look at Claims 29 through 34, I think it's very clear that the community in Claim 29 is a cash community. You look at the preamble, which that's the first thing the board went to when they started analyzing Claim 29. It talks about distributed cash functionality that's performed by this process. Obviously, the board believed that that breathed meaning into the limitations of the claim. There's two other limitations of the claim that expressly talk about the functionality of that community being cash. And, in fact, it makes sense because if you look at the teaching of 145, the only community 145 teaches about is a cash community. So I don't think you can restrict Claim 29 to a community and argue that's any different from a cash community. And even if you could, they didn't argue that. Below, there was no argument ever presented that if the board found that Inahara doesn't teach allowing a cash community, that nevertheless, because of additional arguments or analysis or evidence, the board should have found that a Claim 29 was different. That's a new argument that was presented for the first time on appeal. I don't understand. Is your argument that communities have to be cash communities in Claim 29? Yes, in part. So Claim 29, the community of Claim 29, is clearly a community that accomplishes the functionality of cashing. And that's what the board looked at when it analyzed Claim 29. It recites the preamble. I mean, it recites five words from the preamble that expressly call out that cash functionality. Did the board construe Claim 29 the way you did? Because I didn't read the board's decision. To be clear, there was no emphasis in any of the underlying proceedings on Claim 29 being any different from the other claims. By appellant, in terms of, hey, the community in Claim 29 is different from a cash community, and here's why. And here's why you should find that even if Inahara doesn't teach allowing into a cash community, you should somehow teach that Claim 29 doesn't allow— Inahara teaches that it does allow a client to join a community. That argument was never presented by the board. When you say never— Or to the board. You say the argument was never presented to the board, but it seems to me as I'm looking at the board's opinion right now, it clearly treated community in Claim 29 different from cash community in the Claim 2 group and went through and discussed Inahara and whether it discloses a community list or not. Am I missing something? No, I think the board did separately— The board clearly treated it— They did consider the claim language of 29 separately, for sure. And they looked at communities and they said— Excuse me. Nowhere did they say it's a cash community. Nowhere did they say the two limitations should be treated identically, right? That's correct. I mean, doesn't that make sense? I mean, if you say cash community in one claim and in the next claim you just say community, I mean, claim differentiation principles would suggest that those two things have potentially different meanings. So I think in this case, there's a lot of differences between Claim 29 and the other claims, so I don't think you could make a strict judgment based on claim differentiation that the intended difference between those two claims was one was a community that was focused on cashing and one wasn't. And if you look at the— Again, if you look at the preamble for Claim 29, which recites a method for dynamic distributed data caching, and you look at the other elements of Claim 29, I don't think you can make that judgment. I'll be honest with you. I find the board's fact findings about what Inahara does or doesn't disclose regarding cash community and community list to be nonsensical and somewhat internally inconsistent. I understand your argument, and you're making a great argument that attempts to infuse some logic into the board's decision by virtue of telling me they should— they were really looking at this, like if the term has the same meaning. It's just that they didn't find that anywhere. They didn't say that anywhere. I'm struggling with the board's decision. I'm not saying that means you lose. There are fact findings to be made here, and those fact findings were made by the board, and I've got to give them substantial evidence deference, but I am struggling with how I can reconcile their finding on 29 with their statements on 24. This is—you know exactly what I'm talking about. You struggle with it too. That's why you've tried to justify it on a different ground than what I can find anywhere in the board's decision. But I do think if you look at 824 to 826, which I do think are three very important pages of the board's decision, what they're really doing is they're undertaking— they're trying to give credence to appellant's arguments down the blow and really look hard at, okay, here's a server group, and here's a unified cash hierarchy. How do both of those constructs in O'Hara compare to a community? And they start with a server group, and they go through an analysis of the server group, and they look at, hey, how does this match up against the definition of community? And they say there's one similarity here. They both have similarities in communications. But then they go on, and then the next page they talk about, if you look at what O'Hara really is concerned about, it's really the overall hierarchy that's a community. It's not an individual server group. And they don't expressly hold, as appellants say, that a server group is a community. They talk about that similarity, but it's only on the next page when they're talking about the hierarchy that they actually hold the community in O'Hara is therefore the overall hierarchy. And I think the other thing that's important here... You don't think I should interpret the board on 26 and 27 as saying in O'Hara server groups are communities? On which page are you on? 26 and 27. I'm sorry, that's the blue brief, 26, 27. A, 24. So there's two statements made, and I assume you're talking about the first one. Based on the complete record before us, we find that in O'Hara's server group... Yeah, that's the one I have circled. So in my mind, and again, there is some lack of clarity there, but in my mind... We interpret community as similarity or identity or sharing participation. Based on the complete record before us, we find that in O'Hara's server group has similarity or identity or sharing of participation and fellowship. Right. I agree with that. So completely agree, they found a similarity within server groups. And they found that that would satisfy the definition of community. I don't think they go that far. We interpret community as this. We find on the factual record this reference discloses the exact thing that's defined as community. Relative to one aspect of the community, which is communications. And I think that's important. Where do they... Pertaining to managing communications. Why... And on the next page, when they talk about the multicast... Why does that matter? I don't understand. Because in any community, right, there's a lot of similarities. So I have similarities, some similarities with everyone in this room. It doesn't mean that in O'Hara teaches that those similarities constitute a community. And in fact, you know, if you look at the boundary... We spent some time talking about boundaries on appellants. There's really no boundary between server groups. I mean, actually, contiguous server groups that are next to each other share members. You know, they overlap. They overlap at a server group leader. And that server group leader, all it's doing is forwarding communications that come down the tree. So to argue that those two are separate communities because they have common characteristics doesn't make sense. Because the common characteristics that are shared within one server group are shared with the whole, even outside of that server group. But couldn't the problem with what you're arguing right now be that if you're just talking about a community, you and opposing counsel are all members of the community of folks who can practice before the Federal Circuit Bar, but the claim doesn't say Claim 29, cash community, it just says community. So why isn't it enough when the board finds in O'Hara's server group have similarity in communications, why do they also have to find anything related to cashing at that point? Because I think if you look at the overall limitation and the overall teaching of O'Hara, O'Hara teaches a community, and even if you were to find that... You might be right. The problem I'm having is that the board's opinion is sort of less than a model of clarity. I mean, everything you're saying makes logical sense to me. It really does. It's just that I'm struggling with what feels like a very poorly written... Sure, and I understand that. But I think at the end of the day, what the board's decision came down to is what is the overall teaching of O'Hara? And you've got Dr. Thornton testifying that someone picking up this reference and picking up Smith would not conclude, oh, yes, in O'Hara and Smith, when you combine them together, that teaches limiting access to a cash community. They just wouldn't do that. You're taking a very thin reading of one, really, one paragraph, one sentence of one figure, and you're saying that should overcome O'Hara's broad teaching of, hey, we're going to take all comers. We're never going to deny a server entering that cash community. And you only have one expert testifying on the factual circumstances here. If you look at a Pelham's expert, they don't say anything on allowing a client to join a cash community relative to the teachings of O'Hara. And then you've got another expert who has 20 pages of testimony saying, hey, I know this is a Japanese reference. I'm going to translate it for you. Here's the central teaching, and here's exactly what one ordinary skill in the art would come away with learning from that. I think I'm out of time here. Thank you. Okay, thank you. We have a little bit of rebuttal time left. Mr. Brash. Thank you, Your Honor. This is a claim scope dispute at its heart, and it goes to the 145 patent, and whether the claims of the 145 patent require that the cash community be an isolated cash community or whether the claims of the 145 patent require the cash community to be the largest possible cash community you could identify. Those claims are not in the 145 patent, and they don't even make sense in the context of the 145 patent. My colleague talked about the principle of the- It is true, though, is it not, that you never argued to the board below that the community identified in Claim 29 and its follow-on was anything other than a cash community? That is true. But, Your Honor, on Claims 29 through 34 and 36, the problem with the board's analysis is that it did not have any analysis. It applied the same analysis from Claims 1 and 2, what we called Claim Set 1. It applied that same analysis to Claim Set 2. If you look at Claims 29- You don't dispute that Claim 29, the community at issue there, has to be a cash community, do you? I don't dispute in the context of the 145 patent that the communities are talking about are cash communities. Claims 29 through 34 do not even have the concept of allowing, which is what predicated the entire analysis by the board on Claim Set 1. I mean, it's missing the entire limitation on which- the board ruled with respect to the other claims. And then the board took that rationale and ported it over to another set of claims. It simply doesn't even have the same element. That's a big, big problem. The rationale simply doesn't apply. That's the problem with Claims 29 through 34 and 36. But I'm not- I want to direct the court's attention back to Claim Set 1 because my colleague has again said this is a factual question. You don't hear me debating any factual issues about the disclosure of Inohara. I will agree with the court, agree with my colleague, that there is a server group that is a community and there is also a multi-cash hierarchy that can be viewed as a community as well. My contention is that the claims scope of the 145 patent does not render any of those facts problematic from an application of the prior art standpoint. There can be bigger communities. Look at the 145 patent. And I would refer the court specifically- But what the board found was it had to be a cash community. So what they're saying is, yes, these servers might function as a community, but the cash community that we're talking about is the hierarchy. But the board also acknowledged that the server group of Inohara had a cash directory and that that cash directory identified the cash content within the server group. That is a cashing community. And then the board said, but wait a minute, it's not the relevant cash community because there's a bigger picture hierarchy in play. That bigger picture hierarchy is irrelevant to the claims of the 145 patent. There's no factual disputes here, is my point. It's a legal dispute. And I want to direct the board to column 13, lines 33 through 36 of the 145 patent, which I think is the best example in the 145 patent of two things. You see in this column 13, lines 33 through 36, and this is to provide a little context, it's talking about a new client attempting to join a cash community in the 145 patent. It says if no communities are found or found communities do not allow a cash module to join, then cash module may attempt to start its own cash community. Now talk about the principle of inclusion, which is how my colleague described it, in Inohara, because you can be rejected from a server group because a server group has a max limit, which is undisputed. You can be rejected from a server group but still join another community and be part of the hierarchy. In the 145 patent, if no communities are found or you're not allowed to join a community, you start your own community and you're part of the cashing system. There is no requirement in the 145 patent that a server has to be rejected from the broadest cash community. As long as there is a rejection from a cash community, period, you've satisfied the claim limitations. The 145 patent has a principle of inclusion, just like Inohara. The points that my colleague has made and that the board adopted are points that are irrelevant within the proper scope of the claims of the 145 patent. Thank you, Your Honor. Okay. Thank both counsel for the argument. The case is taken under submission.